Filed 9/20/23  Balali v. Huntington Reproductive Center Medical Group CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| SHAGHAYEGH BALALI et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> HUNTINGTON REPRODUCTIVE CENTER MEDICAL GROUP et al., <br><br> Defendants and Appellants. | B324323 <br><br> (Los Angeles County Super. Ct. No. 22STCV15294) |

APPEAL from an order of the Superior Court of Los Angeles County, Gregory Keosian, Judge.  Affirmed.

Sheppard, Mullin, Richter & Hampton, Todd E. Lundell, Shannon Z. Petersen and Jenna G. Crawford for Defendants and Appellants.

Balali & Associates, Shideh N. Balali; Joseph S. Socher, Esq. and Joseph S. Socher for Plaintiffs and Respondents.

———————————————

# INTRODUCTION

Huntington Reproductive Center Medical Group (HRC Fertility) and Wendy Shubin (collectively, Defendants) appeal from the superior court's order denying their petition to compel arbitration of the civil action filed by Shaghayegh Balali and Sean Bafan (collectively, Plaintiffs). We conclude that the claims Plaintiffs assert do not fall within the scope of the parties' arbitration agreement. We therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Plaintiffs Obtain Fertility Treatment and Sue for Alleged Interference with Their Relationship with a Gestational Surrogate

Plaintiffs' complaint alleges the following. HRC Fertility is a medical corporation that provides medical treatment in reproductive medicine. Shubin is a physician's assistant employed by HRC Fertility. Beginning in or about April 2019, Plaintiffs obtained fertility treatment from HRC Fertility.

At some point in 2019, HRC Fertility advised Plaintiffs that the only way they could have their own biological child was to use a gestational surrogate. Plaintiffs secured a gestational surrogate on their own and paid "substantial amounts" for testing required by HRC Fertility to have the surrogate approved. Plaintiffs entered a contract with the surrogate and an embryo was transferred to the surrogate in or about June 2020. In mid-2021, Plaintiffs and their surrogate were ready for a second embryo transfer, and they executed a new contract and informed HRC Fertility of the contract. In November 2021, after it conducted various testing on the surrogate, HRC Fertility transferred an embryo to the surrogate. However, on

2

December 13, 2021, HRC Fertility informed Plaintiffs and the surrogate that the surrogate was miscarrying the embryo.

On December 20, 2021, the surrogate went to HRC Fertility for follow-up treatment; Plaintiffs were not present. At that visit, "Shubin . . . informed the gestational surrogate that . . . HRC Fertility had two other couples that they would like to connect [*sic*] the gestational surrogate because these two other couples were having trouble with their surrogates not being able to pass the required testing." Defendants later connected the surrogate with one of those couples, and the surrogate terminated her contract with Plaintiffs. Before the surrogate's December 20, 2021 visit to HRC Fertility, she and Plaintiffs "had communicated and agreed to continue with their contractual relationship for another embryo transfer."

On May 9, 2022, Plaintiffs sued Defendants for tortious interference with contractual relations, negligent interference with prospective economic relations, and intentional and negligent infliction of emotional distress, premised on the theory that Defendants' actions caused the surrogate to end her surrogacy relationship with Plaintiffs.

## B. Defendants Move to Compel Arbitration

On June 29, 2022, Defendants moved to compel arbitration of Plaintiffs' claims based on a stand-alone arbitration agreement the parties had signed on April 9, 2019. The agreement provided, in relevant part:

"**Article 1**

"It is understood that any dispute as to medical malpractice that is as to whether any medical services rendered under this contract . . . were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be

3

determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.

"**Article 2**

"Pursuant to this Mutual Binding Arbitration Agreement ('Arbitration Agreement'), all disputes, claims or controversies against HRC Fertility and its agents, employees, owners, shareholders, officers, directors, partners, and associates, arising out of the rendering of professional services, as well as the breach, termination, enforcement, interpretation or validity of any written agreement pertaining thereto, and including claims for negligence, battery, wrongful death, lack of informed consent and loss of consortium, as well as the determination of the scope or applicability of this Agreement, shall be exclusively determined by binding arbitration, before the American Arbitration [*sic*] pursuant to the Commercial Arbitration Rules of the American Arbitration Association ('AAA') in Los Angeles, California, and shall be governed in accordance with the laws of the State of California. Said binding arbitration shall be before a single arbitrator with at least 20 years' experience in the field of medical malpractice. . . . [¶] . . . [¶] . . .

"**Article 6**

"This Arbitration Agreement may be revoked by written notice delivered to HRC [Fertility] within 30 days of signature and if not revoked will govern all professional services received by the Partner(s) and all other disputes between the parties. If

4

this Arbitration Agreement is revoked within 30 days of signature, treatment will be discontinued.  Services will be itemized fee for services and a partial refund, if available, will be credited to your account.  [¶] . . . [¶] . . .

"**Notice:  By signing this contract, you are agreeing to have any issue of Medical Malpractice decided by neutral arbitration and you are giving up your right to a jury or court trial.  See Article 1 of this contract.**"

In their motion, Defendants contended that Plaintiffs' claims fell within the scope of the arbitration agreement under both article 2 and article 6.  With respect to the language in article 2 (requiring arbitration of claims "arising out of the rendering of professional services"), Defendants argued, "Plaintiffs' claims 'aris[e] out of' the rendering of professional services by HRC Fertility to Plaintiffs and their surrogate."  Based on the language in article 6 (providing that if the arbitration agreement is not revoked it "will govern all professional services received by the Partner(s) and all other disputes between the parties"), Defendants argued that because Plaintiffs had not revoked the agreement, it applied to " 'all disputes' " between the parties, "regardless of whether those claims arise out of the rendering of professional services."  Defendants also contended that the agreement was enforceable, because there was no evidence of duress, fraud or unconscionability.

Plaintiffs filed an opposition, in which they argued that the arbitration agreement did not cover the parties' dispute and was instead limited to medical malpractice claims.  Plaintiffs argued that their claims "ha[d] nothing to do with [Defendants'] medical/professional services as they are not a surrogacy agency

5

and are not in the business of providing services relating to surrogacy matching." Plaintiffs also contended in their opposition that the arbitration agreement was unenforceable because it was unconscionable in several respects, including that it was one-sided in that HRC Fertility was not required to arbitrate any claims it might assert against Plaintiffs, and that Plaintiffs did not have a meaningful opportunity to negotiate or opt-out.

Defendants filed a reply brief which reiterated their arguments regarding the scope of the arbitration agreement. In addition, in response to Plaintiffs' unconscionability arguments, Defendants contended that the agreement provided Plaintiffs an opportunity to opt out, that it was " 'fully mutual in scope,' " and that any unconscionable terms could be severed from the agreement.

## C.     **The Superior Court Denies Defendants' Motion**

The superior court held a hearing on Defendants' motion to compel arbitration on September 27, 2022, and took the matter under submission after oral argument. On October 6, 2022, the court issued a written ruling denying the motion. The court concluded that "no portion of Plaintiffs' claims fits within the scope of the arbitration agreement." With respect to the language in article 2 about the scope of arbitrable claims, the court stated, "Plaintiffs' claims do not arise from the rendering of professional services, and are not founded upon medical negligence or associated theories." Regarding the language in article 6, the court found, "It is unreasonable to read the 'all other disputes' language, buried in the paragraph governing the process for rescission, as expanding the scope of the arbitration agreement . . . ." Thus, the court concluded, "the reasonable

6

interpretation of this 'all other disputes' language does not expand the agreement to include the whole universe of possible legal claims, but merely refers to the kinds of disputes listed in [a]rticle 2 of the same agreement, which includes claims related to professional services before specifically listing other included claims." Because it found Plaintiffs' claims were not subject to arbitration, the court did not address whether the arbitration agreement was unconscionable.

On October 24, 2022, Defendants timely filed a notice of appeal.

## DISCUSSION

Defendants challenge the denial of their motion to compel arbitration. Code of Civil Procedure[1] section 1294, subdivision (a) provides that "[a]n order dismissing or denying a petition to compel arbitration" is appealable.

## A.    Standard of Review

In deciding a petition to compel arbitration, "the trial court sits as a trier of fact, weighing all the affidavits, declarations, and other documentary evidence, as well as oral testimony received at the court's discretion, to reach a final determination." (*Engalla v. Permanente Medical Group, Inc.* (1997) 15 Cal.4th 951, 972.)

"If the superior court's decision regarding arbitrability is based on resolution of disputed facts, we review the decision for substantial evidence." (*Baker v. Italian Maple Holdings, LLC* (2017) 13 Cal.App.5th 1152, 1158, citing *Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th

---

[1] Unspecified statutory references are to the Code of Civil Procedure.

7

644, 653.) " 'However, where the trial court's denial of a petition to arbitrate presents a pure question of law, we review the order de novo.' " (*Mendez v. Mid-Wilshire Health Care Center* (2013) 220 Cal.App.4th 534, 541.) Thus, we review de novo a trial court's interpretation of an arbitration agreement which does not depend on conflicting extrinsic evidence.

Finally, "[i]t is the ruling, and not the reason for the ruling, that is reviewed on appeal." (*Muller v. Fresno Community Hospital & Medical Center* (2009) 172 Cal.App.4th 887, 906-907.)

## B.   The Applicable Legal Principles

Both parties agree, and we concur, that the California Arbitration Act (CAA; § 1280 et seq.) governs in this case. Under the CAA, "[a] written agreement to submit to arbitration an existing controversy or a controversy thereafter arising is valid, enforceable and irrevocable, save upon such grounds as exist for the revocation of any contract." (§ 1281.) "A party who claims that there is an applicable written arbitration agreement may petition the superior court for an order compelling the parties to arbitrate." (*Rice v. Downs* (2016) 248 Cal.App.4th 175, 184-185 (*Rice*), citing § 1281.2.)

"[T]he Legislature has expressed a 'strong public policy in favor of arbitration as a speedy and relatively inexpensive means of dispute resolution.' " (*Moncharsh v. Heily & Blase* (1992) 3 Cal.4th 1, 9.) Given this policy, "doubts concerning the scope of arbitrable issues are to be resolved in favor of arbitration. [Citations.] Therefore, in the absence of indication of contrary intent, and where the arbitration clause is reasonably susceptible of such an interpretation, claims . . . will be deemed subject to arbitration." (*Ericksen, Arbuthnot, McCarthy, Kearney & Walsh, Inc. v. 100 Oak Street* (1983) 35 Cal.3d 312, 323, fn. omitted;

8

accord, *Rice*, *supra*, 248 Cal.App.4th at p. 185 [holding that an arbitration provision should be interpreted to require arbitration " ' "unless it can be said with assurance that the arbitration clause is not susceptible to an interpretation covering the asserted dispute" ' "].)

"There is no public policy, however, that favors the arbitration of disputes the parties did not agree to arbitrate." (*Aanderud v. Superior Court* (2017) 13 Cal.App.5th 880, 890.) Furthermore, the policy favoring arbitration "does not override ordinary principles of contract interpretation." (*Rice*, *supra*, 248 Cal.App.4th at p. 185.) " 'The court should attempt to give effect to the parties' intentions, in light of the usual and ordinary meaning of the contractual language and the circumstances under which the agreement was made (Civ. Code, §§ 1636, 1644, 1647).' [Citation.] 'The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.' (Civ. Code, § 1641.) ' "A court must view the language in light of the instrument as a whole and not use a 'disjointed, single-paragraph, strict construction approach' [citation]." ' [Citation.] An interpretation that leaves part of a contract as surplusage is to be avoided. [Citation.]" (*Rice*, *supra*, at pp. 185-186.)

C. **The Arbitration Agreement Extended Beyond Medical Malpractice Claims**

Plaintiffs argue that the arbitration agreement is limited to medical malpractice claims, which would plainly not include their claims based on Defendants' alleged interference with Plaintiffs' relationship with their surrogate. They rely on the language in article 1 of the agreement, as well as the language just above the signature block, which refers specifically to "[m]edical

9

[m]alpractice" disputes. However, as Defendants note, section 1295 requires this specific language to be included in any arbitration agreement that is intended to cover medical malpractice claims, and it is well-established that such an arbitration agreement can also provide for arbitration of other types of claims. (See *Titolo v. Cano* (2007) 157 Cal.App.4th 310, 319 ["As long as the arbitration agreement includes the language required by section 1295, as it did here, the parties may broaden their agreement with additional language"]; *Coon v. Nicola* (1993) 17 Cal.App.4th 1225, 1232 ["nothing in the wording of [section 1295] states that medical malpractice arbitration agreements may not also include additional provisions"].)

The agreement here does include additional language in article 2 that extends the scope of the requirement to arbitrate beyond just medical malpractice claims. We turn to that language now.

## D.	The Arbitration of Claims "Arising out of the Rendering of Professional Services"

Defendants argue that arbitration of Plaintiffs' claims is required under article 2 of the agreement. Article 2 provides, in relevant part, that "all disputes, claims or controversies against HRC Fertility and its agents, employees, owners, shareholders, officers, directors, partners, and associates, arising out of the rendering of professional services . . . shall be exclusively determined by binding arbitration."[2]

---

[2] As noted above, article 2 also provides for arbitration of "all disputes, claims or controversies . . . arising out of . . . the breach, termination, enforcement, interpretation or validity of any written agreement pertaining" to the "rendering of

10

In *Rice*, this court addressed the scope of an arbitration clause that provided for arbitration of " 'any controversy between the parties arising out of' " operating agreements for companies the parties had formed.  (*Rice, supra,* 248 Cal.App.4th at pp. 180, 187.)  After surveying both California and Ninth Circuit decisions, we found that "provisions using only phrases such as 'arising out of' or ' "arising from" ' . . . extended only to disputes relating to the interpretation and performance of the agreement [citations]."  (*Id.* at p. 189.)  We thus concluded, "the parties intended the arbitration provision to apply to a very limited range of controversies, not ones merely connected with the operating agreements or transactions contemplated by those agreements and certainly not all controversies between them."  (*Id.* at p. 190.)  We also held that, while the arbitration provision could potentially apply to tort claims arising from the operating agreements, "a tort claim based upon violation of an independent duty or right originating outside of the agreement does not *arise*

---

professional services," "as well as the determination of the scope or applicability of this Agreement."  Defendants did not argue to the trial court, nor do they contend on appeal, that Plaintiffs' claims arise out of "the breach, termination, enforcement, interpretation or validity" of any agreement between the parties.  Similarly, Defendants did not argue below, nor do they now contend, that under the clause which provides for arbitration of "the determination of the scope or applicability of" the arbitration agreement, the question whether Plaintiffs' claims fall within the scope of the arbitration agreement must be decided by an arbitrator.  (See *Douglass v. Serenivision, Inc.* (2018) 20 Cal.App.5th 376, 386-387 [parties may designate the arbitrator as the one to decide whether a particular dispute is subject to arbitration].)

11

from the agreement and falls outside the scope of the arbitration provision." (*Id.* at pp. 190-191.)

Although the arbitration provision in *Rice* applied to disputes arising out of operating agreements and this case involves an arbitration provision that applies to disputes arising out of "the rendering of professional services," the conclusions we reached in *Rice* regarding the scope of "arising out of" language apply here with equal force. By requiring arbitration of disputes "arising out of the rendering of professional services," the agreement here extends only to disputes relating to the performance of the professional services, and does not encompass tort claims based on duties originating independently from those professional services or the agreements governing those professional services. This is consistent with the general meaning of "arising out of," which connotes some type of causal connection. (Black's Law Dict. (11th ed. 2019) [defining "arise," in relevant part, as "[t]o originate; to stem (from)" and "[t]o result (from)"]; see *Ford Motor Co. v. Montana Eighth Judicial Dist. Court* (2021) 592 U.S. ──, ── [141 S.Ct. 1017, 1026] [stating that " 'arise out of' " "asks about causation" in interpreting rule extending a state court's jurisdiction to claims that " 'arise out of *or relate to* the defendant's contacts with the forum' "]; *Doe v. Princess Cruise Lines, LTD* (11th Cir. 2011) 657 F.3d 1204, 1218 [" 'Arising out of' requires the existence of some direct relationship between the dispute and the performance of duties specified by the contract"]; *Hartford Accident & Indem. Co. v. Civil Service Employees Ins. Co.* (1973) 33 Cal.App.3d 26, 32 [" 'The phrase "arising out of" is equated with origination, growth or flow from the event' "].)

12

As alleged by Plaintiffs, Defendants interfered with Plaintiffs' relationship with the surrogate *during* the provision of professional services, but that is the extent of the connection. Plaintiffs assert that Defendants "are not a surrogacy agency and are not in the business of finding and facilitating surrogacy relationships for their patients," and Defendants do not dispute this. Defendants point out that the alleged torts occurred while Plaintiffs were patients of HRC Fertility, while the surrogate was present at an HRC Fertility facility, and while HRC Fertility was providing medical services to the surrogate. However, none of this is sufficient to establish that the alleged torts "aris[e] out of" Defendants' professional services. Furthermore, Plaintiffs' tort claims do not "aris[e] out of" Defendants' rendering of professional services because they are premised on common law legal duties that are independent of the professional services rendered by Defendants and the medical relationship between the parties.[3] Thus, Plaintiffs' claims do not "aris[e] out of the rendering of professional services" by Defendants, and arbitration is not required by article 2 of the arbitration agreement.[4]

---

[3] Defendants cite several cases in which courts have held that the arbitration provisions at issue covered plaintiff tort claims. We agree that the arbitration provision in this case can cover tort claims; indeed, the provision states that its scope includes negligence and other tort claims. However, in order for tort claims to be covered by the arbitration provision, they must "aris[e] out of the rendering of professional services." That is not the case with Plaintiffs' tort claims.

[4] *Titolo v. Cano*, *supra*, 157 Cal.App.4th 310, relied upon by Defendants, is distinguishable. In that case, the plaintiff sued her former treating physician for intentional interference with

13

Defendants cite two cases in support of their argument that Plaintiffs' claims "aris[e] out of" Defendants' rendering of professional services: *EFund Capital Partners v. Pless* (2007) 150 Cal.App.4th 1311 (*EFund*) and *Khalatian v. Prime Time Shuttle, Inc.* (2015) 237 Cal.App.4th 651. Neither case persuades us to reach a different conclusion. The arbitration clause in *EFund* applied to " '[a]ny dispute or other disagreement arising from or out of' " a consulting agreement. (*EFund*, *supra,* at p. 1317.) The court stated, "The Courts of Appeal have construed arbitration clauses similar to the present provision to broadly encompass tort claims having their roots in the contractual relationship between the parties." (*Id.* at p. 1323.) However, two of the three cases the *EFund* court relied upon involved arbitration agreements with substantially different, broader language than the agreements at issue here and in *EFund.* Specifically, in *Berman v. Dean Witter & Co., Inc.* (1975) 44 Cal.App.3d 999, the agreement provided that " '[a]ny controversy between [the parties] arising out of *or*

_____

prospective economic advantage and related torts based on allegations that the physician told the plaintiff's disability insurer that the plaintiff "was not disabled, but was a scam artist and a fraud," and disclosed the plaintiff's medical file to the insurer. (*Id.* at p. 313.) The court held that the plaintiff's claims fell within the scope of the parties' agreement to arbitrate " 'any dispute as to medical malpractice,' " concluding that "communications between a physician and his or her patient's disability insurer, at the request of the patient, regarding the diagnosis and/or treatment of the patient by that physician, constitutes the rendering of medical services." (*Id.* at p. 314.) Nothing in *Titolo* supports an argument that Defendants' alleged tortious communications with Plaintiffs' surrogate constituted professional services.

14

*relating to* this contract or the breach thereof, shall be settled by arbitration' " (*id*. at p. 1002, italics added), and in *Izzi v. Mesquite Country Club* (1986) 186 Cal.App.3d 1309, the agreement required arbitration of actions " 'instituted . . . *in connection with*' " the parties' agreement (*id*. at p. 1315).  As we observed in *Rice*, the difference between "arising out of," on the one hand, and "arising out of or related to" or "arising out of or in connection with," on the other hand, is material, with arbitration agreements that include only the "arising out of" language being " 'generally considered to be more limited in scope.' " (*Rice*, *supra*, 248 Cal.App.4th at p. 186, citing *Cobler v. Stanley, Barber, Southard, Brown & Associates* (1990) 217 Cal.App.3d 518, 530.)[5]

Furthermore, even if we were to apply the standard adopted by the *EFund* court, we would conclude that Plaintiffs' claims in this case do not have their "roots" in the Defendants' rendering of professional services or the parties' medical relationship, because the only connection is that the alleged torts occurred in parallel at the same time and place as the

---

[5] The third case the *EFund* court relied upon, *Coast Plaza Doctors Hospital v. Blue Cross of California* (2000) 83 Cal.App.4th 677, also involved language different from the language utilized in the agreement at issue here*,* as it provided, " 'Any problem or dispute arising under this [a]greement and/or concerning the terms of this [a]greement . . . shall be arbitrated.' " (*Id*. at p. 681, fn. 2, italics omitted.)  The court concluded that the plaintiff's claims in that case fell within the scope of this arbitration provision because they were "clearly based upon" reimbursement rates set forth in the parties' agreement (*id*. at p. 684), and thus "unquestionably have arisen under the [parties' a]greement and are inextricably related to its terms and provisions."  (*Id*. at p. 685.)

15

professional services. *EFund* is also distinguishable because the claims at issue in that case did arise from the agreement at issue. (*EFund*, *supra*, 150 Cal.App.4th at pp. 1325-1326.)

In *Khalatian v. Prime Time Shuttle, Inc.*, *supra*, 237 Cal.App.4th 651, the arbitration provision applied to " 'any controversy or claim between the parties arising out of *or relating to* [the parties' employment agreement] or any alleged breach [of the agreement], including any issues . . . that th[e] [a]greement or any part [t]hereof is invalid, illegal, or otherwise voidable or void.' " (*Id.* at p. 655, italics added.) As noted above, this type of arbitration provision, which includes the language "arising out of or relating to," is materially broader than the arbitration provision at issue in this case. (*Rice*, *supra*, 248 Cal.App.4th at p. 186.) Furthermore, the plaintiff's claims in *Khalatian* fell squarely within the scope of the arbitration clause because he claimed the parties' agreement improperly classified him as an independent contractor. (*Khalatian*, *supra*, at p. 659.)

Finally, we reject Defendants' argument that arbitration is required here because of the policy favoring arbitration. As we have noted, this general policy favoring arbitration does not mean that a court should compel arbitration where the claims fall outside the scope of the applicable arbitration agreement. That is the case here, as Plaintiffs' tortious interference and related claims do not "aris[e] out of" Defendants' "rendering of professional services," and are not premised on legal duties arising from the professional services or the parties' medical relationship.

16

**E. Article 6 of the Agreement Does Not Expand the Scope of the Arbitration Requirement**

Defendants also contend that arbitration of Plaintiffs' claims is required under article 6 of the agreement. Article 6 provides, in relevant part: "This Arbitration Agreement may be revoked by written notice delivered to HRC [Fertility] within 30 days of signature and if not revoked will govern all professional services received by the Partner(s) and all other disputes between the parties." Seizing upon the language "all other disputes between the parties," Defendants argue that, in the event the agreement is not revoked, arbitration is broadly required for "all" disputes.

Plaintiffs respond that article 6 "is clearly intended to govern revocation of the agreement, not define the scope of coverage." They argue that Defendants' interpretation is "unreasonable" because the term purportedly broadening the scope of the agreement is essentially hidden in a provision otherwise unrelated to the scope of the agreement. Plaintiffs also argue that the reference to "all other disputes" refers back to "the specific list" in article 2. In addition, Plaintiffs rely on Civil Code section 1641, which provides: "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."[6]

---

[6] In their reply brief, Defendants contend that Plaintiffs have forfeited these arguments because they did not address the provisions of article 6 in the trial court. We exercise our discretion to address the legal arguments raised by Plaintiffs given that our standard of review is de novo, the arguments present questions of law on undisputed facts, Defendants have

17

Properly read, the language of article 6 does not expressly require arbitration of any claims or disputes regardless of their subject matter. Instead, it provides that the agreement "will govern" the professional services and any disputes. This contrasts starkly with the language in article 2, which provides in express terms that the specified "disputes, claims or controversies . . . *shall be exclusively determined by binding arbitration.*" (Italics added.) We interpret the "will govern" language in article 6 to mean that, with respect to the professional services provided by Defendants to Plaintiffs and any other disputes between the parties, the question whether arbitration is required is determined under the terms of the arbitration agreement, and specifically article 2 of the agreement.

Our conclusion is supported by the rule of construction which requires us to harmonize all the provisions in an agreement so as to give effect to every part of the agreement. Interpreting the "all other disputes" language in article 6 as a broad arbitration provision would render the language in article 2 as surplusage without any practical force, a result we must avoid. (*Rice, supra*, 248 Cal.App.4th at p. 186.)

Because Plaintiffs' claims do not fall within the scope of the parties' arbitration agreement, the trial court did not err in denying Defendants' motion to compel arbitration. Given our resolution of the arbitrability issue, we need not reach the

---

fully briefed the issue, and the trial court relied on the arguments in its ruling. (See *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24 [appellate courts have discretion to address a question of law based on undisputed facts even though issue was not raised in the trial court].)

parties' arguments about whether the arbitration agreement is unconscionable, and we express no opinion on that issue.

## DISPOSITION

We affirm the trial court's order denying Defendants' petition to compel arbitration. Plaintiffs are awarded their costs on appeal.

NOT TO BE PUBLISHED


WEINGART, J.


We concur:


ROTHSCHILD, P. J.


BENDIX, J.

19